Good morning, Your Honors. John Ballas on behalf of the appellant Fausto Diaz-Lozano. I'm intending to reserve three minutes for rebuttal. Mr. Diaz-Lozano challenges the denial of a suppression motion and raises four sentencing issues on appeal. In his motion to suppress, he challenged the government's installation of GPS tracking devices and the extended monitoring of him over an extended period. I have a little bit of a cold, I think. We recognize in the briefs that this court's decision in Pineda-Moreno resolves much of his suppression claim. And I would like to, while I've argued in the briefs that the decision is erroneous and should be reheard and banked, I'd like to focus now on my second argument there, that the court should remand with instructions for the government to provide additional information on the number of tracking devices, when they were used, and the circumstances of how long that they were monitoring Mr. Diaz-Lozano. What's the relevancy of that? Well, it's hard to determine that when the government hasn't informed us of what additional GPS tracking devices they've placed on. It's true that there's no direct evidence that they introduced a trial of any, but it is very possible. It's hard to do a fruit of the poisonous tree analysis without knowing exactly what information. I think the thrust of the question, or at least my question is, what could be poisonous about it in terms of the exclusionary rule given Pineda-Moreno? In other words, if there are five devices, why is it still covered by Pineda-Moreno? Well, Pineda-Moreno did not determine that if a device was placed on someone's personal, on their private property, that that was okay under the binding appellate precedent at the time. They specifically reserved that for a future date. What they decided was that binding appellate precedent. I read your argument in that regard, and my reaction was, well, that's not really a GPS problem. In other words, if somebody goes on somebody's private property, then that's a separate problem. I mean, that is, which wouldn't be covered by Pineda-Moreno, but which we have no reason to think happened here. Well, we don't know. That's the problem. We do know that the government's, one of their officers said that they placed GPS units more than once, but they only disclosed it one time. And so, again, Mr. Pineda-Moreno was, believed that they were tracking him for an extended period of time, back when he was even crossing the border in February of 2010. And so, we don't know. And so, because the government never disclosed this information, it was never really the grounds to be able to challenge it. If they disclosed it, they would have violated an ethical duty. I mean, we can ask them to find out when they stand up whether there is such a thing, but it seems to me that if they went on to private property and put some device on it and it had any connection at all to the ultimate connection, even if it weren't introduced, they would have had an obligation to disclose it. And if they didn't, they've got a problem, but they didn't. Well, they may have decided that any evidence that they obtained for it, they did not use at trial, was not part of its case, was their determination may have been it wasn't exculpatory, they were not under an obligation to. They agreed that there wasn't anything else. Didn't they do that? I don't believe they. What they said was there was no evidence introduced at trial in any. I thought they said it flat out there wasn't any. We can ask them. So let me address the sentencing issues, and specifically the first three sentencing issues. The first one is that the government included in the guideline analysis five pounds of actual methamphetamine regarding a transaction on April 19, 2010, when officers only seized one and a half pounds during a traffic stop. They got you the additional amount, the total five pounds, based on a single reference in a wiretap call. During an earlier wiretap call, the participants were discussing shirts and the delivery of two or two and a half shirts, and there was one single reference later to a delivery. There were actually going to be five shirts delivered. Why is that not enough? It's not enough because we don't know whether or not what type of substance was delivered, whether it was cocaine or methamphetamine, and we don't know the purity of the amount. And because we don't know either one of those, it's kind of speculated to reach the five pound. Wasn't it 98% purity of what was delivered? It was one and a half pounds that was delivered in that accident. Which was 98% pure. Right. Okay. And negotiations regarding that or the discussions that you're talking about relating up to that, were they not? Yes. Okay. So at this point, it seems like it's a question of fact that the district court determined that there were five pounds based on the reference to the shirt in the phone calls, although the wiretap. So would we not be reviewing for clear error? I think clear error is appropriate, but I think that the error is clear here where there isn't sufficient evidence to make that kind of an inference. When there's been prior discussions and transactions regarding cocaine, when we don't know the quantity or the substance that was actually delivered, it wasn't sufficient. The second sentencing issue is that the district court erred in adding a two-level enhancement for possession of a firearm. When Mr. Diaz-Lazada was never found with possessing a firearm, the probation officer, in my opinion, correctly found that the enhancement was inapplicable. That the firearm was in the Gilroy household? Yes. Yes. Yes. And there was evidence that there was a stipulation that he didn't know the people who were arrested, and so he had to ignore it. Correct. Correct. I mean, with this standard, I mean, following our law, it seems that we have to determine whether it was reasonably foreseeable that the defendant appellate here would anticipate that there might be a weapon in the stash house in Gilroy. Two parts to it, whether it's reasonably foreseeable and whether it's within the scope of the jointly agreed criminal activity. The only evidence we have here is that he had a phone number with an area code for San Jose, and it referred to his source as San Jose. It would be a little bit, I think the government would have a much stronger position if there was some evidence that he knew there was this gigantic stash house, and then maybe it's more reasonable to presume that it would be protected with firearms. But in this case, as far as the evidence showed, Mr. Diaz-Lozada could have determined that they were delivering one pound through certain amounts of cocaine or methamphetamine from different places in the San Jose area. Ultimately, it wasn't worth it. There's 600 pounds of drugs found as part of this drug operation. It seems like the sheer scope of the drug trafficking operation here might support that it was reasonably foreseeable for Mr. Defendant to know that the Gilroy stash house would have a weapon to protect that kind of stuff. I think if he knew that there was a stash house that had 610 pounds of it. He had to know, based on what he was doing, there were other parts to this. Certainly, he had associations with other people, and he had a source of drugs that was delivering quantities about that kind of cocaine. The way they found the Gilroy house was that somebody went from his house to the Gilroy house, that they followed someone else. They followed someone back after they went to his house to the Gilroy house, and they knew the house was on Roof Grove. They knew the approximate location in Gilroy. They knew it because they followed him. They followed him back to someone else. Now, the judge or the government, I'm not sure which, just made their surmise that when he said San Jose, he meant Gilroy. Is there any reason to think that? I mean, they seem to think that San Jose was shorthand for Gilroy. Gilroy is what? 40 miles away or something? Right. Maybe the general San Jose area, but yes. There's no evidence that he knew of the existence of this stash house. Was there any basis for an inference that he knew that there was something going on in Gilroy? No. No, in fact, it's most likely that he wouldn't have known because you would try to keep the existence of that large of a stash house to as small number of people as possible unless someone would have a need to know. And that's why the argument, I believe, is sufficient to apply the two-level enhancement as a probation officer determined. The third sentencing issue is that the court erred in applying a three-level managerial role enhancement based on, because it was insufficient evidence that he exercised control or supervised other individuals. The district court found the enhancement applied on the basis of one person that was involved in marijuana cultivation that says he was working for Mr. Diaz-Lazada. But even if that is true, that would not support a three-level enhancement for organizational role, only a two-level enhancement because the marijuana conspiracy was entirely separate. It had only involved three people, not five or more. But as the guidelines also talk about, whether it's otherwise extensive, you could have the opportunity that even if it was less than five, this was otherwise extensive. The guidelines do say that. The district court did not make any finding it was otherwise extensive, and I don't believe it was. It was a simple marijuana cultivation on a marijuana garden. I mean, it's a difference of one level. Is that right? Yes. If we assume that the two conspiracies, you can't combine, and I'm not quite sure why you can't combine the two conspiracies for this purpose. Is there any case law or anything that says you can't? I'm not aware of it, but I think that, you know, when you look at conspiracies, you actually tend to look at them separately. They're actually charged separately. This wasn't a case where they charged one overall conspiracy involving marijuana. One was a growing operation. Right. And one pretty far in the north, and the other was this trafficking operation. Right. And different individuals, different locations. Other than that, what did the district judge say about this enhancement? He applied it only on the basis of the one person in the marijuana cultivation, Bermudez, who said that he worked for, was tending the gardens for Mr. Diaz Lozada, and that that was sufficient to apply the enhancement. The other conspiracy seemed pretty extensive. Well. One was a fairly small marijuana growing operation. Yes. And the other one, I believe there's no evidence that he exercised control or managed or supervised any other individuals. It was essentially a broker-directed transaction. I think the matter should be remanded so that the district court judge can consider that. I think that since we had a full and fair hearing the first time in sentencing, the court should make the determination that only at most a two-level enhancement applies. I guess I'll turn it. You're right. I mean, ultimately, it's a 35-53 analysis based on the accountability. If we want to remand for whatever reason, could that district court judge consider everything else and basically have a new sentencing proceeding they know of and perhaps consider the other conspiracy? Maybe confined to just dealing with that one conspiracy. I guess my position would be that on that one enhancement, the government presented its evidence. The court made its finding. If the evidence isn't sufficient, I think the court could determine that the evidence isn't sufficient as presented. There's no evidence that he exercised control or supervised anyone in the larger methadone conspiracy. More sensibly, what we do is we look at what the district court did, which is deal with the marijuana conspiracy, and we say in that one it wasn't sufficient. That would leave open the question of the methamphetamine conspiracy on remand. So that would be, I guess, the other alternative. Yes. That would be helpful to your client. It would be more helpful if the court ruled that the enhancement didn't apply. That's a great question, though, do you think? I mean, because you run the risk. When we send it back for resensing, the judge can decide, you know what, upon further reflection, I'm going to up or depart or I'm going to go higher. You run that risk when you send it back. Well, can I say it? Okay. And it's just a level. I don't know that it would be. I mean, it's not a material difference here in light of what the sentence received. And it's a one level, so I'm just trying to figure out, is there a harmless error application here for this? So my position on that would be, first of all, there's a general presumption against increasing the sentencing remand for vindictive after an appeal, unless there's new evidence or new circumstances or something, new conduct at present, which I don't think is here. I didn't know this from last year. Essentially, there's almost no such thing as harmless error in this. There's a miscalculation. Okay. I think. Anyway, if you have time, I'll give you the data. I'm not sure. Did you argue this, the two conspiracies down below? Well, I wasn't the attorney. The attorney argued that there was no evidence for the enhancement. There was some discussion, I think, about. Can you look maybe in time, you know, if that was specifically argued? Okay. Thank you. May it please the Court. Michael Beckwith on behalf of the United States. I was trial counsel in this case. Your Honor, I'd like to go right to an issue that we were just touching on. That is the issue of sentencing, and specifically the defendant's connection to the house in Gilroy. Do you have any knowledge of Gilroy at all? Yes, Your Honor. We have evidence of a trial record that he told Detective Robles that he went to the house and got 10 pounds from that house. We have his name in ledgers. I thought that was in the record, but that clearly isn't in the record. It is in the record, Your Honor. I went there. I'm sorry. That you went there. Yes, Your Honor, that he went to that. He calls, of course, the house in San Jose, but he says, I went there, I picked up 10 pounds in the past. We also have his name. How do we know it wasn't the house in San Jose? Your Honor, because we have his name in the ledgers that were in the house in Gilroy. How do we know he was there? Your Honor, the court made a specific factual finding that in light of the house in San Jose was the house in Gilroy. We don't know. Based on the fact that his name was on a ledger? Based on the fact that his name was on a ledger, based on the fact that when he was on a wiretapped call talking about obtaining drugs from the house in San Jose, those drugs came to his house, and then they followed them back to the house in Gilroy. Not him. They followed other people back. That's correct, Your Honor. And what's the standard the government has to prove? A preponderance? It's a preponderance standard, Your Honor, and that we believe was clearly met. So it's a preponderance, and then we were due for clear error. That's correct. Your Honor, unless the court has questions on that. One other thing that just may be related to Ransom on this evidentiary hearing question. Yes, Your Honor. Your brief has a slightly cryptic statement, which I did find, that says that the government is not aware of any evidence that was reasonable to any other. Yes, Your Honor. We are unaware of any other evidence. Does that mean you're unaware of any other surveillance or you're unaware of, I mean, were you measuring, I guess I want to know, were you purposely measuring your words to allow for the possibility that there was other surveillance, but it didn't lead to evidence in your opinion? Your Honor. Or that there wasn't other surveillance. I couldn't quite tell what you were saying. Your Honor, I can tell you right now, we do not, we are unaware, completely unaware of any other surveillance evidence. We have, there's no evidence in the record of that, and we are unaware of that. I know there's no evidence, but you're representing that you don't know of any. We do not know of any. What about the managerial role? Yes, Your Honor. With regard to that, I do believe if we go to remand, there is a risk of actually a four-level enhancement if the court were to find, were to look at the methamphetamine and marijuana conspiracies and say that, yes, clearly the methamphetamine, but that's not a job, really, you know, to deal with what would happen on remand. We have to decide whether there was a basis here for that three-level enhancement. I'm a little bit confused about this. You have Bermuda for sure. Yes, Your Honor. You believe that person was managed by the defendant, right? But you need five or something otherwise extensive. Can you explain to me how we reach that level? Yes, Your Honor, with Solario. Solario is the other conspiracy. Yes, Your Honor. It's the meth conspiracy, not the marijuana conspiracy. Are we able to combine the two and mix and match, so to speak? Yes, well, Your Honor, if we take the defense argument, and actually separate it, which I don't recall the argument below, but let's assume it's there, Solario is part of that more extensive methamphetamine conspiracy, and I believe it's the 21st at the meeting at Walmart. Mr. Diaz has given methamphetamine to Solario and then directs him to give that methamphetamine. I guess I haven't been clear, and I apologize. What confuses me is that it seems that this court judge predicated his three-level enhancement solely in regard to the marijuana conspiracy and Bermudez's involvement in that conspiracy, and that he did not make any determination at all about whether there was any enhancement by reason of the meth conspiracy. Am I wrong about that? Your Honor, I'm not sure that the district court made such a fine cut in saying there were two conspiracies and Bermudez is in one, but clearly the record indicates that he focused on Bermudez because Bermudez is the easy case. As to the suit, I think it's pretty clear. But, you know, then you're going to take Solario who's in a different conspiracy. There's no finding made by the district court judge. You're going to add the two together to collectively come up with the requisite, the extensive activity on the five people involved. I don't get that. Does that belong? Your Honor, I'm not clear that there are two. There are, in fact, two separate conspiracies. First of all, there were charges, two conspiracies. Is that not the case? That's true. That's true. Is that not sufficient for press purposes? Had nobody ever alleged that there was one conspiracy and the only alleged there were two conspiracies? I suppose in theory we could have charged one conspiracy with two conspiracies. And just from what they actually were, they didn't seem to have that much to do with each other. I mean, one was this large trafficking operation and the other was growing some marijuana up in the hills. And, Your Honor, under Alexander, the court, we can see that the court focused on Bermudez, but under Alexander, this court can make a ruling or can uphold an enhancement on any basis in the record. And here you have Solario in the methamphetamine conspiracy. You don't have to say that. We can make a factual finding? No, you can support, you can affirm the district court's accusation. But the district court didn't even make a finding that he was supervising Solario, did he? No, there's no discussion of Solario. We can make that finding? You can affirm based on the record, yes, Your Honor. You guys are making a finding? No, you're only affirming that the application was appropriately approved. You're affirming that the district court judge was correct in seeing for some other reason and finding that the three-level enhancement was warranted on the marijuana conspiracy. That's exactly... If we were only dealing with the marijuana conspiracy, would you be willing to concede that there's not sufficient evidence to support a three-level enhancement? Yes, Your Honor, we would. So you really need to tack on Solario, which, to me, there's very little about Solario in the record here, and you need to have five who are otherwise extensive. So your argument would be that if you considered the meth conspiracy, that was otherwise extensive? Yes, Your Honor. And there's a basis for that in the record, is what you're claiming, right? That's correct, but we also believe there's a basis to believe that Diaz directed Solario in the context of that conspiracy. Were there five people who were relying upon the otherwise extensive product? Your Honor, it would be otherwise extensive, and he's a manager, a low-level manager, within that extensive conspiracy, so that would get us to three, as opposed to... A, the otherwise extensive other meth, in order for this to be a three-level enhancement. Yes, Your Honor, I don't believe that's going to be... It's an international drug conspiracy. I don't think that's going to be difficult to make. Well, I'm troubled by the big scheme, actually, quite frankly, and I don't see any case law that says that that's okay to do. Do you know of any case society that supports that? No, Your Honor, I'm not aware of that. Where did he get sentenced? I can't remember, within the sentencing guideline range. Well, Your Honor, this is the point I wanted to come back to, that the guidelines in this case were life. If we make this distinction between a two- and three-level enhancement, we're bringing the guidelines down by one level, and in this case, the district court expressly pegged this defendant's sentence to the man in Gilroy, placing him just above it at 210 months. So he... It would be... What was his range? His range was life, and so... It was life? It was life, and he came down to 17. And he pegged it to what, I'm sorry? He pegged it to the man in Gilroy, Your Honor. I see. And so those men had sentences in the high 100s, 190, 170, I believe, and he gave this defendant a sentence of 210 months, so he departed from life, which would... I mean, it's excessive, a 12-year departure. It's very unlikely that anything's going to change if we do come back, and it's possible that... I'm sharing this with you because I'm a little concerned with it, Judge. I've had a couple of these situations. I'm a man from the Second Circuit. My colleagues may not have done the same thing, but I always get the little bit of a break from the remand period. So I'm just joking, you know. Also, can we go back to the guns for a minute? Yes, Your Honor. So let's assume that the Gilroy house was a San Jose house. I mean, it seems a little flimsy to me, but still, what do we know that he knew that would have been... We know on your representation that he got three pounds of methamphetamine from that house. Is that what we know? Well, we know there were actually three transactions from that house. We know there's a two-pound transaction that's captured on a wiretap. We're talking about bringing two shirts from the Gilroy house to Sacramento. There's a five-pound transaction. But what if he knew that it was dealing with the Gilroy house? Yes, Your Honor. He's calling the Gilroy house. And, in fact, we know the Gilroy... He's calling, what, the phone number that's in the Gilroy house, the person that's in the Gilroy house? Yes, Your Honor. So we have the stipulation that he didn't know any of the people who were picked up at the Gilroy house. Well, he didn't. The stipulation, to be very precise, was that he did not know the three people that were arrested there. That's absolutely correct. But there's another stipulation that he didn't have any involvement with the Gilroy house, wasn't aware of the Gilroy house. In fact, as we know, his name is in ledgers found at the Gilroy house. Well, obviously, the people in the Gilroy house, if they were the center of the operation, would be keeping ledgers about him. But that doesn't mean that it doesn't have anything to do with whether he knew the scope of the operation in the Gilroy house. Well, we believe he did, Your Honor, because the center of the operation is actually in Mexico. And when he called into the Gilroy house and asked for methamphetamine, the Gilroy house told him that, no, you can't have it. So Mr. Diaz called into Mexico, got the authorization, arranged his food distribution, changed, and then they brought methamphetamine to him. So he has not only knowledge of the house, but enough pull within this organization to get its distribution authorization changed. But that's enough under our case law, assuming all that, for him to foresee that there's a gun. People he doesn't know, and so just because it's a big operation, period, the end or other reason. Well, we think that's, we think all of the factors that we've been talking about, the phone calls, the wire taps, the surveillance, all of that, yes. So all of these two is that there was a big operation in the Gilroy house? Which the defendant is regularly telling the undercover officer that he is a part of and is aware of. Okay, but I still want to know, is that enough under our case law? It is, Your Honor. For him to foresee that there was a gun there? A drug trafficker of this level of experience, yes, absolutely. And there's two more points, two more factual points that we haven't quite touched on. One is that the methamphetamine in this case was, much of it was blue, which at the time was brand new in the market and very distinct. When the methamphetamine was seized in Sacramento, part of it was blue, part of it was white. When the methamphetamine was seized in Gilroy, part of it was blue, part of it was white. And both of those were at 98% purity. And so that's another connection that the defendant has. So I'm assuming for present purposes that he had enough connection to the Gilroy house, but the question is, is it sufficient just by itself that he was getting his drugs from a big operation? Yes, Your Honor, we believe it is. We believe those facts, we established those by preponderance in sentencing. We believe the court made clear, factual findings, and those findings were of huge and clear error. And in light of these facts, there was no clear error regarding the foreseeability of this. Tell me again, what was in the ledger that was found in the Gilroy house? His name was in that, correct? Yes, Your Honor. And what capacity, what did it say? So it would be something along the lines of two pounds Fausto Diaz, two pounds Fausto, one pound Fausto. And so, I mean, you know, this isn't banking-level accounting. This is narcotics accounting, and that's, from our standpoint, that's rare to see, and I think incredibly persuasive. Your Honor, last I'll point out that in the case of the suppression motion, the officers here were acting within the context of the law as it existed then, and suppression of the law in this case would serve no deterrent value. MacGyver was in place. Hubbard was in place. And this was a short-term monitoring case. When the vehicle was tracked, it was less than a day, better part of an afternoon, from point A to point B, exactly on all fours with Hubbard, which has been in existence for over 30 years. This is not a long-term monitoring case. This is a, we have one tracker in this case that was monitored for the better part of an afternoon. It was from Home Depot straight to a marijuana grow. And we believe that in light of MacGyver, in light of Hubbard, and the other cases that exist at that time, the officers acted clearly within the parameters of the law then, and suppression would be unnecessary now. Does the Court have further questions? Submit. Thank you. Thank you very much. Just to answer Judge Riviera's question, the defense attorney in his briefs argued that the enhancement did not apply, really based only on the methamphetamine conspiracy. And then when it got to the sentencing, the prosecutor also pushed the alternative theory that he would be eligible for a supervisor enhancement based on the marijuana cultivation, and that the Court made the finding only on the marijuana cultivation. And the other last point I would like to bring up is on remand. If the Court does remand for resentencing, we now have this new guideline amendment that reduces all the guideline levels by two levels, that I think would apply to resentencing. So that even with a one or a two-level reduction, and then you add that two-level guideline amendment reduction, I don't think there's much of a risk that the Court would go above the sentence he imposed the first time, and some decent chance he would go below the sentence. In any event, your call is not for us to make that decision. You will need to do that. Yes, I know this, Judge. Okay, thank you very much. Thank you. Thank you both for your arguments. The case of United States v. Caslas, I hope you submit it.
judges: Berzon, Murguia, Block